# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 18, 2013 Session

## IN RE KEISHEAL N. E. ET AL.

**Appeal from the Juvenile Court for Coffee County**
**No. 935-05J      Timothy R. Brock, Judge**

---

**No. M2012-01108-COA-R3-PT - Filed February 4, 2013**

---

This is the second appeal by the father of three minor children challenging the termination of his parental rights. Mother's parental rights were terminated in 2009 and are not at issue. In the first appeal, this Court found the Department of Children's Services failed to make reasonable efforts to reunite the children with the father and therefore reversed the termination of Father's parental rights. *In re Keisheal, N.E.*, No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *1 (Tenn. Ct. App. May 28, 2010). Following the first appeal, a new petition was filed. After the second trial, the trial court found the petitioners established the ground listed in Tennessee Code Annotated § 36-1-113(g)(8)(B)(i) that: "[t]he parent . . . is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume the care and responsibility for the child in the near future. . . ." The trial court further found the Department of Children's Services made reasonable efforts to reunite the children with the father, and that termination was in the children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

Jeffrey C. Gruber, Murfreesboro, Tennessee, for the appellant, Keith E.[1]

Robert E. Cooper, Attorney General and Reporter, Martha A. Campbell, Deputy Attorney General, and Douglas Earl Dimond, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

Keith E. is the father of Keisheal, born in August of 2000; Keila, born in May of 2004; and Michael, born in July of 2005. Keith E. ("Father") suffers from schizoaffective disorder, a mental health condition which requires therapy and medication. If left untreated, the illness can cause visual and auditory hallucinations as well as manic episodes and depression.

The genesis of these proceedings occurred on December 21, 2005, when the Department of Children's Services ("the Department") filed a petition to declare all three children dependent and neglected due to allegations of the mother's drug use around the children. Father was not living with the children at the time; he was residing in Dayton, Ohio. The children were placed in the temporary custody of their paternal grandmother in Tennessee.

Following the first hearing, which occurred on February 6, 2006, the Juvenile Court of Coffee County declared the children dependent and neglected and adopted a safety plan that specified several requirements for the mother but none for Father. Identical safety plans were adopted on July 13, 2006, and January 25, 2007. As before, neither plan listed any requirements or recommendations for Father. Shortly after the adoption of the third safety plan, the placement of the children changed from the paternal grandmother to the maternal grandmother, who resided in Tullahoma, Tennessee.

On May 9, 2007, the Department filed a petition to modify the safety plan. The Department alleged that the mother was endangering the children because she and her domestic partner, who had a history of domestic violence and sexual abuse, were living with the children at the home of the maternal grandmother. At the time, Father was residing in Murfreesboro, Tennessee. The Department asked the court to place the children into the custody of the Department, which the trial court granted on May 10, 2007. All three children were placed in foster care with James and Vickie L., where they remain to this day.

A meeting was held to create permanency plans for the three children on May 29, 2007. Father was not present. The plans listed many requirements of their mother, while, again Father's responsibilities were minimal.[2] Father's first visit with his children was on August 8, 2007. Father's next visit with the children was one year later, in August 2008. Father did not see the children again until February 2009.

---

[2]For more details regarding Father's responsibilities under the permanency plans, see *In re Keisheal*, *N.E.*, No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *1-2 (Tenn. Ct. App. May 28, 2010).

In the midst of the proceedings, Father suffered two episodes of hallucinations that required hospitalization. *See In re Keisheal N. E.*, 2010 WL 2176104, at *3. Father was then referred by hospital staff to the Guidance Center in Murfreesboro, Tennessee for mental healthcare. He was prescribed medication in the form of bi-monthly shots as well as counseling and home visits. However, for a myriad of reasons, Father's participation in the treatment plan was erratic. Although the Department was aware Father was receiving counseling for psychological issues, and Father executed a medical records release form to the Department, the Department did not monitor Father's participation in the treatment plan at the Guidance Center or otherwise provide Father with mental health services. As a consequence, Father's illness went largely untreated, and he was unable to maintain regular contact with the children, the Guidance Center, or the Department.

On July 11, 2008, the Department filed a petition to terminate the parental rights of both parents. The grounds that pertained to Father were: 1) abandonment by failure to visit, Tenn. Code Ann. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(ii), and 2) substantial noncompliance with the permanency plan, Tenn. Code Ann. §§ 36-1-113 & 37-2-401. After the close of the proof on the first day of trial, the Department sought to amend the petition to add incompetence as a parent due to an impaired mental condition. Tenn. Code Ann. § 36-1-113(g)(8), which the trial court permitted. *See In re Keisheal N. E.*, 2010 WL 2176104, at *4. The trial on the petition to terminate Father's parental rights began on May 21, 2009. Both parent's rights were terminated by order entered on October 1, 2009. Father appealed; Mother did not.

In the first appeal, this Court reversed the termination of Father's parental rights based upon two findings: 1) the Department failed to prove that Father's mental condition is likely to remain impaired to the degree that it is unlikely Father will be able to care for the children in the near future, as required by Tennessee Code Annotated § 36-1-113(g)(8)(B) - (C), and 2) the Department failed to make reasonable efforts toward reunification, as required by Tennessee Code Annotated § 37-1-166, because it failed to provide services to deal "with the root of Father's problems, his mental illness." *In re Keisheal N. E.*, 2010 WL 2176104, at *1.

Following our decision in the first appeal, the Department became more proactive in helping Father address his mental health issues. Revised permanency plans for the children provided that, "[t]he Department will now need to work with [Father] to determine if he will be able to safely and effectively parent his children after receiving consistent mental health treatment over a period of no less than six months." Father was required to comply with the treatment regime at the Guidance Center, obtain safe and stable housing, and "achieve medical management for his mental illness." The revised plans also provided that, "return to parent needs to be added as a goal on the permanency plan again."

The Department's caseworker also coordinated efforts with Father's caseworker at the Guidance Center – she communicated regularly with the Guidance Center staff, scheduled Father's appointments, and provided Father with transportation (or provided his mother with financial assistance to drive him). The Department also hired a professional counselor to attend Father's weekly one-hour supervised visitation sessions with the children to assist him in learning how to appropriately relate to the children, and assisted him with housing applications and provided clear instructions on what is expected of him to obtain suitable housing.

Following an annual review hearing on March 17 and June 6, 2011, the trial court found that Father "has not attended to his mental health needs as recommended by his mental health providers." Specifically, the court found that Father "has attended less than half of counseling sessions, medication management appointments and appointments with his psychiatrist," and "has made no progress on obtaining housing adequate to care for the three children despite assistance offered by [the Department]." The court concluded that Father's visitation with the children should remain supervised due to Father's lack of progress. Thereafter, Father's visitation with the children was terminated because Father's infrequent visitations were causing significant distress to the children.

On November 10, 2011, the children's guardian ad litem filed a Petition to Terminate Parental Rights of Father, and an Amended Petition on February 23, 2012. The grounds listed were Father's mental impairment and failure to adhere to the permanency plan. Trial on the Amended Petition took place on March 8, 2012. Several personnel from the Guidance Center testified at trial, including Father's Licensed Clinic Social Worker ("LCSW"), outpatient therapist, and case manager. The LCSW was qualified as an expert witness in "therapeutic treatment of schizoaffective disorder," and testified that regular therapy was essential for Father to be able to function at a level where he would be able to care for children. The Department case manager, Felicia Eady, also testified. Ms. Eady detailed the Department's efforts to help Father get treatment and Father's lack of cooperation with the Department or the Guidance Center.

Also Dr. Thomas Monroe, who performed a psychological evaluation of Father regarding the first petition in 2009, testified by deposition. Dr. Monroe stated that Father was "very ill" and, without medical and psychological treatment, Father was incapable of caring for himself or the children. Ms. Eady testified that she arranged an appointment for Father to be re-examined by Dr. Monroe in February 2012, but that Father cancelled the morning of the appointment. Ms. Eady testified that she had not been able to get in contact with Father since that time despite her repeated attempts. Father denied that he had missed any appointments, home visits, or medication injections, however, the trial court found Father was not a credible witness, and that Ms. Eady was a credible witness.

-4-

At the conclusion of the trial, the court found that the Department and the guardian ad litem had presented evidence that clearly and convincingly established Father's mental impairment ground for termination, that Father was unable to assume responsibility for the children due to his mental illness, and that "based upon the long unsuccessful treatment of his condition that it is likely [Father] will continue to remain so impaired such that he will be unable to assume the care of the children in the near future." However, the court concluded that non-compliance with the permanency plan was not an appropriate ground for termination, because "it is not reasonable to expect him to comply with his obligations because of his mental impairments." The court further found that "the Department has, on its own accord and by enlisting the resources of other agencies, gone beyond what is reasonably expected to assist [Father] . . . ." Finally, the court determined that termination was in the children's best interests, primarily due to the lack of a relationship with Father and the close bond the children shared with their foster parents, James and Vickie L., who planned to adopt all three children if given the opportunity.

Based on the above findings, the trial court terminated Father's parental rights and Father then perfected his second appeal.

## ISSUES

Father contends the Department has again failed to exert reasonable efforts to preserve and reunite the family, and that the trial court erred in ruling that Father is, and will be for the foreseeable future, mentally incompetent to parent his children. Conversely, the Department asserts that the trial court properly found that it met its burden of proving by clear and convincing evidence that it made reasonable efforts to reunite the family, that termination of Father's parental rights was appropriate based upon mental incompetency, and that termination of Father's parental rights was in the children's best interests.

## ANALYSIS

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. Tenn. Code Ann. §

36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proven by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810) (no Tenn. R. App. P. 11 application filed).

THE DEPARTMENT'S RESPONSIBILITIES

The Department is the agency responsible for the care and protection of dependent and neglected children; it plays a pivotal role in such matters. Because of the Department's role in the lives of dependent and neglected children and their families, the General Assembly has imposed on the Department "the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166).

The General Assembly recognizes, as a matter of public policy, that families are among the fundamental building blocks of society, Tenn. Code Ann. § 36-3-113(a); thus, the statutes empowering the courts to remove children from the custody of their parents state that one of the Department's primary purposes is to protect children from "unnecessary separation" from their parents. *In re Tiffany B.*, 228 S.W.3d at 157 (citing Tenn. Code Ann. § 37-2-401(a)). In this regard,

> The Department must memorialize its efforts in an individualized permanency plan prepared for every dependent and neglected child placed in its custody. The requirements in each permanency plan must be directed toward remedying the conditions that led to the child's removal from his or her parent's custody. *In re Valentine*, 79 S.W.3d at 547; *In re M.J.B.*, 140 S.W.3d at 656-57; *In re*

-6-

*L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003). Reflecting the Tennessee General Assembly's understanding that the ability of parents to rehabilitate themselves depends on the Department's assistance and support, permanency plans place obligations on the Department to help parents become better able to provide their children with a safe and stable home and with consistent and appropriate care. *In re C.S., Jr.,* No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *9 (Tenn. Ct. App. Sept. 14, 2006).

*In re Tiffany B.,* 228 S.W.3d at 158 (footnote omitted).

Reasonable efforts are statutorily defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors the courts are to use to determine reasonableness include:

(1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)) (footnote omitted). While the Department does not have to exert herculean efforts, they must do more than "rely on parents to facilitate their own rehabilitation." *In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *5 (Tenn. Ct. Ap. Dec. 13, 2007) (citing *In re M.B.*, No. M2006-02063-COA-R3-PT, 2007 WL 1034676, at *5 (Tenn. Ct. App. Mar. 30, 2007)).

This Court has repeatedly addressed the importance of Department employees using "their superior insight and training to assist parents" in remedying the problems that lead to removal of the children, including mental health problems, and the importance of the Department exerting reasonable efforts to assist a parent whose mental condition presents an obstacle to reunification. *See In re M.A.P.*, No. W2008-013520COA-R3-PT, 2009 WL 2003357, at *16 (Tenn. Ct. App. July 10, 2009) (quoting *In re C.M.M.*, No. M2003-

011220COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. March 9, 2004)).[3] Mental illness compromises a parent's ability to address his or her own problems and "a parent with serious mental illness cannot reasonably be expected to simply lift herself up by the bootstraps with no assistance." *In re M.A.P.*, 2009 WL 2003357, *18 (citing *In re A.R.*, 2007 WL 4357837, at *6-10). Therefore, the fact that a parent in need of mental health services does not request the assistance of the Department to deal with his or her mental health needs does not relieve the Department of its responsibility to exert reasonable efforts to assist the parent. *See id.* at *14–15.

Of course, there may be cases where a parent is simply incapable of being mentally rehabilitated, and no amount of effort on the part of the Department or other service providers could make a difference in that parent's mental condition. In such a case, it would not be "reasonable" to require the Department to use its finite resources to assist that parent with mental rehabilitation. The record in the first appeal of this matter was insufficient to establish this was the case with Father, "at least not yet," as we noted in our first opinion. *In re Keisheal*, 2010 WL 2176104, at *8. Indeed, the proof presented at the first trial was that, "Father could have up to a 50 percent success rate with proper treatment, and that it should be known within six months if there is any chance for him to be able to properly care for his children." *Id.* at *4. Thus, in Father's case, "reasonable efforts" by the Department should have included efforts to ensure that Father received proper treatment.

As noted earlier in this opinion, the Department became more proactive by assisting Father in addressing his mental health issues following our decision in the first appeal. The revised permanency plan provided that the Department would work with Father to determine if he will be able to safely and effectively parent his children after receiving consistent mental health treatment of no less than six months. To assist Father in achieving "medical management for his mental illness,"and in attending his psychological appointments, the Department provided him with at least two options for transportation to the Guidance Center. Father's caseworker at the Department also stayed in constant contact with staff at the Guidance Center. To help him understand and relate to his children, the Department also hired a professional counselor to attend Father's weekly visitation sessions with the children. Finally, the Department made every effort to stay in close contact with Father, and made regular home visits to Father's apartment.

The trial court found that, in spite of the Department's concerted and coordinated efforts following the first appeal, Father "has not attended to his mental health needs as recommended by his mental health providers," "has attended less than half of counseling

---

[3]The Department is not required to make reasonable efforts in cases with "aggravating circumstances," as defined in Tennessee Code Annotated § 37-1-166.

sessions, medication management appointments and appointments with his psychiatrist," and "has made no progress on obtaining housing adequate to care for the three children despite assistance offered by [the Department]." We have reviewed the record and find it clearly supports the trial court's determinations.

Although the Department bears an affirmative duty to exercise skill and diligence in assisting parents, it is equally clear that the Department's efforts "need not rival those of the mythical figure Atlas," *In re J.D.L.*, No. M2009-00574-COA-R3-PT, 2009 WL 4407786, at *7 (Tenn. Ct. App. Dec. 2, 2009), nor must the Department make "Herculean" efforts. *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). The burden is not on the Department's shoulders alone; the road to reunification is "a two-way street." *In re J.D.L.* 2009 WL 4407786, at *7 (citing *In re R .C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov.18, 2002)). "Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children." *Id*. (quoting *Estes*, 284 S.W.3d at 801).

The record before us reveals that the Department exerted more than reasonable efforts that were appropriately fashioned to assist Father in remedying the problems that lead to removal of the children, including specifically Father's mental health issues that presented obstacles to reunification with his children. Unfortunately, those efforts, although more than reasonable, were insufficient to overcome the exceptionally high hurdles posed by Father's mental condition.

MENTAL INCOMPETENCE

Tennessee Code Annotated § 36-1-113(g)(8) provides that a court may terminate the parental rights of a parent if it determines on the basis of clear and convincing evidence that:

> (B) (i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is *presently so impaired and is so likely to remain so* that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future, and . . . ;
>
> (C) In the circumstances described under subdivisions (8)(A) and (8)(B), no willfulness in the failure of the parent . . . to establish the parent's . . . ability to care for the child need be shown to establish that the parental . . . rights should be terminated;

Tenn. Code Ann. § 36-1-113(g)(8)(B)-(C) (emphasis added).

As the statute expressly provides, the Department has the burden to demonstrate by clear and convincing evidence both that Father is *presently* unable to care for the children and that it is *unlikely* that Father will be able to do so *in the near future*. Tenn. Code Ann. § 36-1-113(g)(8).

In this case, it is undisputed that Father's current mental state (that is, at the time of trial) is impaired to the point that he is not competent to care for the children. However, due to the nature of Father's mental illness, resolving the question of the likelihood of Father's ability to care for the children in the near future is closely related to the question of the Department's efforts to assist him. In the first trial, there was an open question regarding Father's future ability to care for the children, because Father was suffering from a serious, but possibly treatable mental illness. Moreover, due to the symptoms of the illness, Father could not be expected to seek treatment on his own.

The evidence presented at the second trial, however, reveals that Father is not only unable to seek out the help he needs on his own, but he is actively determined to avoid treatment and deter the efforts of those who seek to help him. We think this is an important distinction. Father's fierce and long-running opposition to medication and therapy, which the proof established at trial are essential for Father's success as a parent, is readily apparent from the record in the second trial; specifically, in the testimony detailed above regarding the efforts of the Department and of the Guidance Center.

We therefore affirm the trial court's finding that the Department and the guardian ad litem proved that Father is incompetent to adequately provide for the further care and supervision of the children because his mental condition is *presently so impaired and is so likely to remain so* that it is unlikely that Father will be able to assume or resume the care of and responsibility for the children in the near future pursuant to Tennessee Code Annotated § 36-1-113(g)(8)(B).

We also affirm the trial court's determination that substantial noncompliance with the permanency plan is not an appropriate ground for termination because, as the trial court held, "it is not reasonable to expect [Father] to comply with the obligations because of his mental impairments."

BEST INTERESTS OF THE CHILDREN

As we have affirmed the trial court's determinations on the ground of mental incompetence pursuant to Tennessee Code Annotated § 36-1-113(g)(8)(B), we shall now address the best interests of the children. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (stating a court may terminate a person's parental rights if one

statutory ground is proven and it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child.).

The record reveals that Father has no relationship with the children. When the children were taken into custody, Father was living out of state and had not lived with the children for some time. From 2006 to 2009, Father visited the children three times. After the first appeal, Father's visitation became more frequent, but it remained highly irregular and unpredictable, and was eventually terminated because it was causing significant distress to the children. By contrast, the children have lived in a safe and stable environment with their foster parents, James and Vickie L., for over six years. The foster parents share a close bond with the children and wish to adopt the children if given the opportunity.

Having examined the record before us in detail, we find, as the trial court did, that the evidence overwhelmingly established that it is in the best interests of the children that Father's parental rights be terminated. It is unnecessary for us to comment further on this issue.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the Department of Children's Services due to Father's indigency.

_____
FRANK G. CLEMENT, JR., JUDGE